**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**
_____

RANDALL A. HOLMES,

                        Plaintiff,                                    10-CV-1031-A-Sr
                                                              **DECISION AND ORDER**

           v.

PATRICK R. DONAHOE,
POSTMASTER GENERAL,

                        Defendant.
_____


          Shortly after he began working at the Jamestown Post Office, the Plaintiff,

Randall A. Holmes, faced an escalating series of disciplinary actions for violating

a number of Post Office rules.  After the Post Office's first four disciplinary

actions against him, the Plaintiff filed a complaint with the Equal Employment

Opportunity Commission (EEOC) alleging that younger, female Postal

employees were not being disciplined for the same conduct.  The EEOC

dismissed the complaint approximately one year later.

          In the month following the EEOC's dismissal, the Plaintiff was twice

approached by one of his supervisors to discuss updating the Plaintiff's route.

On both occasions, the Plaintiff ignored the supervisor's questions and instead

called the Jamestown Police Department to report that he was being harassed.

Following those incidents, the Plaintiff received two Notices of Removal informing

him that his employment with the Post Office was being terminated.  However, an

arbitrator later found that "discharge was too harsh a penalty" and ordered that the Plaintiff be reinstated.

Seeking back pay and damages, the Plaintiff filed the complaint in this case alleging age discrimination in violation of the Age Discrimination in Employment Act, sex discrimination in violation of Title VII of the Civil Rights Act of 1964, and retaliation for filing his EEOC complaint, also in violation of Title VII. The case was referred to Magistrate Judge H. Kenneth Schroeder, Jr. pursuant to 28 U.S.C. § 636(b) for all pretrial matters and to hear and report upon dispositive motions.

The Defendant moved for summary judgment, which Judge Schroeder's Report and Recommendation (R&R) recommends granting in its entirety. The Plaintiff filed objections only as to Judge Schroeder's recommendation that the Plaintiff's retaliation claim be dismissed. Oral argument was held before this Court on May 21, 2014. Upon de novo review of those portions of the R&R to which the Plaintiff objected, and after hearing argument from the parties, the Court adopts the R&R in its entirety. The Court will therefore grant the Defendant's motion for summary judgment.

## Background

Neither party takes issue with Judge Schroeder's thorough recitation of the facts, which the Court adopts as its own. The Court therefore discusses the facts of the case only as is necessary to provide context for the legal discussion that follows.

The Plaintiff began his career with the Postal Service in 2005 at the age of 48.  Dkt. No. 33 ¶ 2.  At the time, the Plaintiff was assigned to the Post Office in Olean, New York but later transferred to the Post Office in Jamestown, New York.  *Id.* ¶ 4.  At the Jamestown Post Office, the Plaintiff was supervised by a number of individuals, including, as is relevant to the Plaintiff's objections, Cynthia Bailey, the Officer in Charge of the Jamestown Post Office, and Robert Marsh, Jr., the Maintenance Manager at the Jamestown Post Office.[1]  *Id.* ¶¶ 7, 9.  Bailey was transferred to the Jamestown Post Office in 2007 and became the Officer in Charge in 2008.  *Id.* ¶¶ 7-9.  She testified that "[w]hen [she] went to the Jamestown [P]ost [O]ffice, there was a lot of red flags going up as far as unauthorized overtime . . . .  There was just a lot of procedures that were not being controlled by the supervisory staff in a proper manner . . . .  They wanted us to get that under control."  Dkt. No. 33-7 at 23-24, 67:22-68:8.

The Post Office utilizes a progressive disciplinary system.  Under that system, an employee who violates a Post Office rule first receives a letter of warning.  Subsequent discipline results in a seven-day suspension, a fourteen-day suspension, and, eventually, removal.  Dkt. No. 33 ¶ 11.  In slightly over a year-and-a-half, the Plaintiff violated a number of post office rules that quickly

---

[1] The Maintenance Manager at the Jamestown Post Office has a supervisory role and wears a number of different hats.  Bailey testified that "[i]t's been past practice, the manager of maintenance at the Jamestown post office has always helped out in any field, whether it be the carrier section, the finance section. . . . [T]he manager of maintenance is actually assigned as a supervisor to the Jamestown post office, but he has a subtitle of manager of maintenance."  Dkt. No. 33-7 at 22, 66:10-21.

moved him up the Post Office's disciplinary ladder.  The Plaintiff's disciplinary history at the Jamestown Post Office proceeded as follows:

(1) On August 8, 2007, the Plaintiff received a letter of warning charging him with failing to follow instructions.  *Id.* ¶ 12.  The Plaintiff had been instructed that he should not sort bulk mail in a particular way, but nonetheless proceeded to do so.  *Id.* ¶¶ 12-16.  The Plaintiff alleged that other carriers had sorted bulk mail in the same manner.  *Id.* ¶ 17. At some point following this incident, the Plaintiff claims that Bailey yelled at him that "she wanted [the Plaintiff] out of this office."  Dkt. No. 33-6 at 7, 35:5-8.

(2) On October 23, 2007, the Plaintiff received a seven-day suspension for failing to deliver a piece of Express Mail by its guaranteed time of 3:00 p.m.  The Plaintiff delivered the mail at 3:10 p.m., which apparently "resulted in an Express mail failure for the Jamestown Post Office." Dkt. No. 33 ¶ 23.

(3) On January 31, 2008, the Plaintiff received a fourteen-day suspension for "cas[ing] his DPS [i.e., delivery point sequence] mail instead of taking it straight to the street as required."  *Id.* ¶ 26.  Bailey testified that the Post Office has "a million-dollar machine preparing [DPS mail] for us so that the carriers do not have to take the time to case it . . . [I]t's already processed in delivery order and they're expected to take that directly to the street without touching it."  Dkt. 33-7 at 8, 32:13-9.  The

4

Plaintiff admitted that he was aware that he was not supposed to "case" his DPS mail and had not received permission to do so.  Dkt. 33 ¶ 26.

(4) On March 5, 2008, the Plaintiff received a thirty-day suspension after he was seen driving his postal vehicle "without a seatbelt, crossing an intersection with his driver's side door open, making a left hand turn without using a turn signal, and returning from a dismount delivery without his satchel or dog spray."  *Id.* ¶ 32.  (As Judge Schroeder notes, it is unclear how the thirty-day suspension fits into the Post Office's disciplinary system.)

On March 24, 2008, just a few weeks after the fourth disciplinary action against him, the Plaintiff filed a complaint with the EEOC claiming that Bailey and another Jamestown Post Office supervisor, James Hirliman, had discriminated against the Plaintiff on the basis of his age and sex.  *Id.* ¶ 40.  Slightly less than one year later, on March 11, 2009, the EEOC issued a Decision Without a Hearing.  The EEOC's dismissal noted, among other things, that "[b]ased on [the Administrative Law Judge's] review of the record, I find that although Complainant generally avers that employees outside his protected groups [i.e., age and sex] were not disciplined, the objective record shows otherwise."  Dkt. 33-3 at 35.  The EEOC ALJ further held that "assuming, *arguendo*, Complainant has shown a *prima facie* case of discrimination, the [Post Office] has articulated a legitimate, non-discriminatory reason for charging Complainant with the cited disciplines.  Viewing the facts in a light most favorable to Complainant, the

5

Complainant has not shown that he was treated in a disparate manner when he was disciplined for ignoring instructions and in violating safety guidelines."  *Id.* at 36.

In the weeks that followed the EEOC's dismissal of his administrative complaint, the Plaintiff had two interactions with one of his supervisors, Robert Marsh, that led to the Plaintiff being issued notices of removal.  In March 2009, Bailey had assigned Marsh the job of updating the Jamestown Post Office's "managed service points" (MSPs) and Postal Service Form 1546. [2]  Dkt. No. 33-10 at 2.  This task required Marsh to update the MSPs and Form 1546s for each of the Jamestown Post Office's forty-three city mail routes.  Dkt. No. 33 ¶ 59.  According to Bailey, Marsh was able to accomplish this assignment uneventfully for forty-two of the Post Office's forty-three routes.  Dkt. No. 33-7 at 18, 62:19-63:12.  However, Marsh had difficulty updating the MSP scan points and Form 1546 for the Plaintiff's route, which led to the two confrontations in April 2009 that resulted in the Plaintiff's termination.

---

[2] Bailey testified that "managed service points scans" or MSP scans, "are a tool that the supervisors use to determine the amount of time that a carrier is on a route.  They're strategically placed to make sure that there's not an expansion of a 30-minute lunch spot."  Dkt. No. 33-7 at 24, 68:14-18.  MSP scan points are affixed at various points along a carrier's route, meaning that updating the MSP scan points would require Marsh to go out on the Plaintiff's route.  *See id.* at 26, 70:13-16 ("A customer might have tor[n] the scan point off the box, they didn't want it there anymore, or rain might have gotten to it and it's just not working.").  According to Bailey, updating the MSPs was part of the initiative that she was charged with undertaking to control "unauthorized overtime," which was causing the Post Office's payroll to go "out of control."  Dkt. 33-7 at 24, 68:1-8.

Although it is not clearly addressed in the record, Postal Service Form 1564 (Delivery Instructions) appears to be the form that the Postal Service uses to plan and track a carrier's route.  *See* Dkt. No. 33 ¶ 55.

**The April 3, 2009 Incident**

On April 3, while he was updating the MSP scan point locations for the Plaintiff's route, Marsh noticed that the Plaintiff was delivering his route out of order and approached the Plaintiff.  Dkt. No. 33-10 at 2.  After resolving that issue, Marsh asked the Plaintiff to identify the three locations along his route that the Plaintiff would like to use for his lunch break.  *Id.*  According to Marsh,

> At this point [the Plaintiff] became agitated and hostile.  He stated that he did not need to give them to me, and stated that he could take his lunch wherever he choose.  I explained that he can choose the locations, but that he needed to provide them to me.  I explained that they needed to be placed on his [Form] 1564.  He turned away from me, and proceeded to walk away.  I called out to him, and ordered him to return to his [postal vehicle].  He ignored my request and crossed [the street] and delivered mail to a home.  As he descended the front porch of that home, I spoke to him again.  I gave him a direct order to report to his [postal vehicle].  He acknowledged my request and returned.

> As he approached me, he pulled out a cell phone from his pocket.  He opened it, dialed a number and faced away from me. . . .  He stated [to the person whom he had called] that he was being harassed on the street and needed assistance. . . .

> At the conclusion of this call, I attempted to ask my questions again.  He stated that he would not provide them, because we will only use the information to discipline him.  I advised that it was a requirement of his job to have up three [sic] different break locations on his [Form] 1564.  He was still quite agitated and loud.  I attempted to convey to him that he needed to conduct himself in a professional manner.  There was a customer on the street and Mr. Holmes was quite loud, angry and hostile. . . .

> During the next 10 to 15 minutes, I asked for the same information many times.  I repeated three to four times that I was issuing him a direct order to provide me with the information.  Eventually I was able to obtain the information from him and left.

7

> What should have taken but two or three minutes ended up
> taking about twenty.   His failure to professionally communicate
> with his supervisor seems to be a problem that I have seen from
> him since my approval in Jamestown last year.

*Id.*  The Plaintiff later admitted that the phone call he made during the

confrontation was to the Jamestown Police Department.  Dkt. No. 33-6 59:9-14.

Unsurprisingly, the Plaintiff's notice of removal following this incident stated that

"[y]our conduct toward Mr. Marsh, coupled with you recklessly involving the local

police department in an attempt to thwart a U.S. Postal Service official from

carrying out his assigned duties warrants the issuance of this level of discipline,"

i.e., removal.  Dkt. No. 33-4 at 7.

### The April 14, 2009 Incident

The April 14, 2009 incident, for which the Plaintiff also received a notice of

removal, was similar to the April 3 incident.  As recounted in the Plaintiff's second

notice of removal,

> On April 14, 2009, at approximately 9:30 AM, Manager
> Robert Marsh approached you on the workroom floor and asked
> you questions about your route in order to update delivery and
> MSP scan information. When you did not answer, Mr. Marsh
> gave you a direct order to answer his questions. Again, when you
> did not cooperate, he gave you a second direct order. Instead of
> complying with the direct orders, you turned and walked away.
> Later in the morning, you refused to comply with two direct orders
> from Officer in Charge Cynthia Bailey to hang up your cell phone
> on the workroom floor.
>
> * * *
>
> On April 14, 2009, during the Pre-Disciplinary Interview
> [PDI], Ms. Bailey asked if you called the Jamestown Police

8

Department from the workroom floor. In response, you denied doing so. However, as the PDI continued, Sergeant Klanos of the Jamestown Police Department entered the Post Office, interrupted the PDI and asked who called the police to claim harassment by another employee in violation of an order of protection. In response to the Sergeant's question, you then admitted to making the call to the police thereby demonstrating that your provided a false statement to Ms. Bailey.

When questioned, you were asked who you called from the workroom floor. You stated, "none of your business, it is private." When asked if you called the Police Department from the workroom floor, you stated "No, I didn't." However, when the PDI was interrupted by Sergeant Klanos, you admitted to calling the police.

Dkt. No. 33-4 at 11-12. The notice concluded, once again, that "[f]ollowing the instructions of a supervisor is a condition of employment. Your conduct toward Mr. Marsh and Ms. Bailey, coupled with you involving the local police department in an attempt to thwart a U.S. Postal Service official from carrying out his assigned duties and giving a false statement during an investigation warrants the issuance of this level of discipline," i.e., removal. *Id.*

The Plaintiff, through his union, then grieved the removal notices. The arbitrator who heard the grievance found that "[t]here was no evidence that anyone reasonably believed the [Plaintiff] was a danger to himself or others. The act of calling the police may be improper for entirely separate reasons, but in the absence of evidence that the act of calling law enforcement to the Jamestown post office posed a risk of harm to the [Plaintiff] or others, there was no just cause to invoke the emergency placement procedure" that occurred after the April 14 incident. Dkt. No. 33-3 at 23. The arbitrator accordingly found that the

9

Plaintiff's "emergency placement and discharge were without just cause" and ordered reinstatement and back pay.  *Id.* at 28.

This lawsuit followed.  The Plaintiff alleges that his supervisors discriminated against him on the basis of his age and sex and that the Plaintiff was terminated in retaliation for filing his original EEOC complaint.  The Court referred the case to Magistrate Judge H. Kenneth Schroeder, Jr. for all pretrial matters.  The Defendant moved for summary judgment, and Judge Schroeder filed an R&R that recommends granting the Defendant's motion for summary judgment in its entirety.

The Plaintiff then filed objections only as to Judge Schroeder's recommendation that the Court grant summary judgment on the retaliation claim.  Dkt. No. 54-1.  The Court will therefore first address Judge Schroeder's recommendation that the Plaintiff's age and sex discrimination claims be dismissed.  The Court will then address the Plaintiff's objections to Judge Schroeder's recommendation that the retaliation claim also be dismissed.

## The Plaintiff's Age and Sex Discrimination Claims

The Plaintiff's first two claims allege discrimination on the basis of age and sex in violation of Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act.  To prevail on either claim, the Plaintiff must satisfy the familiar burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under *McDonnell Douglas*, the Plaintiff must first make out a *prima facie* discrimination claim.  *Id.* at 802.  "The burden then must shift to the

employer to articulate some legitimate, nondiscriminatory reason for" its action against the Plaintiff.  *Id.*  Finally, the Plaintiff must "show that [the employer's] stated reason . . . was in fact pretext."  *Id.* at 804.

As noted above, Judge Schroeder recommends granting summary judgment as to the Plaintiff's age and sex discrimination claims.  As Judge Schroeder aptly noted in the R&R:

> Assuming for the sake of argument that plaintiff has met his burden of establishing a *prima facie* case [of age discrimination or sex discrimination], his claim fails for lack of evidence that he was disciplined not because he was uncooperative with Mr. Marsh; not because he failed to provide a valid excuse for missing MSP scans; not because he refused direct orders to hang up his cell phone; not because he called the Jamestown Police Department in response to questioning by his supervisors; and not because he lied to his supervisor about calling the Jamestown Police Department, but because of his age and gender.  Plaintiff has proffered no evidence to suggest that younger or female employees engaged in similar conduct without disciplinary action nor has plaintiff proffered evidence of disparaging comments regarding plaintiff's age or gender.  Plaintiff's allegation that Ms. Bailey told plaintiff that she wanted him out of the office is insufficient to raise a triable issue of fact as to whether she wanted him out of the office because of his gender or age.

Dkt. No. 50 at 16.  Because the Plaintiff did not object to the R&R's recommendation that his age and sex discrimination claims be dismissed, *see* Dkt. No. 54-1 at 2, the Court reviews those recommendations for clear error. *See Edwards v. Fischer*, 414 F. Supp. 2d 342, 346-47 (S.D.N.Y. 2006) ("If no objections are filed, or where objections are merely perfunctory responses . . .

reviewing courts should review a report and recommendation for clear error.")
(internal quotation marks omitted).  Finding none, the Court adopts Judge
Schroeder's recommendation that the Defendant's summary judgment motion be
granted as to the Plaintiff's age and sex discrimination claims.

## The Plaintiff's Retaliation Claim

The Plaintiff's objections to Judge Schroeder's R&R relate only to the
Plaintiff's retaliation claim.    The Plaintiff's three objections are as follows:

(1) "The Report and Recommendation Impermissibly Considered Defendant's
Challenge to The Plaintiff's *Prima Facie* Case When That Challenge Was
Raised for the First Time in the Defendant's Reply Brief";

(2) "The *Prima Facie* Case Is, by Definition, Sufficient to Allow an Inference of
Discrimination"; and

(3) "Mr. Holme's Evidence Supports the Reasonable Conclusion of Retaliatory
Intent."

Dkt. No. 54-1 at 3, 4, and 6.  The Court is required to review the Plaintiff's
objections de novo.  *See* 28 U.S.C. § 636(b).

### A. Plaintiff's First Objection

The Plaintiff's first objection is that the R&R impermissibly considered an
argument that was raised for the first time in the Defendant's reply brief to his
motion for summary judgment.  *See* Dkt. 54-1 at 3.  The Plaintiff's objection is
based entirely on one-half of one sentence from *Peca v. Delta Air Lines, Inc.*, 97-
CV-0882E(M), 2000 WL 914112 (W.D.N.Y. July 7, 2000).  The Plaintiff's
quotation from *Peca* omits the sentence's second clause to quote *Peca* as

follows: "The Court does not and will not make a practice of addressing the merits of issues first raised in a reply."  Dkt. 54-1 at 3 (internal quotation marks omitted) (quoting *Peca*, 2000 WL 914112, at *3) (in turn quoting *Knapp v. Miller*, 873 F. Supp. 375, 387 (D. Nev. 1994)).

However, stated in full, *Peca* reads: "The Court does not and will not make a practice of addressing the merits of issues first raised in a reply, *as the opposing party is not afforded any opportunity to respond to new issues raised in a reply, which is ordinarily the last document submitted prior to the Court's ruling on a motion*."  *Peca*, 2000 WL 914112, at *3 (internal quotation marks omitted) (emphasis added).  The italicized language, which the Plaintiff excised from his quotation of *Peca* without acknowledgment, changes the meaning of *Peca* significantly.  The omitted language shows that *Peca* was concerned primarily with the fairness of relying on arguments to which the non-moving party was not able to respond.  New arguments in a moving party's reply brief effectively give the moving party an opportunity to take a free shot at the non-moving party.

However, as the italicized language from *Peca* recognizes, this concern drops away when the non-moving party is given the opportunity to file a sur-reply. That is what happened in this case.  The Plaintiff was given leave to file, and did file, a sur-reply to the Defendant's reply brief.  *See* Dkt. No. 48.  Thus, particularly in light of his selective quotation of authority, the Plaintiff's first objection to the R&R is, at best, disingenuous.  The Court accordingly rejects the objection.

**B. Plaintiff's Second Objection**

The Plaintiff's second objection is that "the R&R . . . erroneously calculated Mr. Holmes's evidence of temporal proximity.  Mr. Holmes has alleged that the temporal proximity calculation should run from the *dismissal* of the EEO complaint to the date of the adverse actions.  The R&R erroneously adopted Defendant's . . . argument of attenuated temporal proximity based on the date of the *filing* of the original complaint and the adverse actions."  Dkt. No. 59 at 4 (emphasis in original).

A *prima facie* retaliation claim requires that the Plaintiff prove the following: "(1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action."  *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 94 (2d Cir. 2001).  The Plaintiff's second objection is that he has made out a *prima facie* retaliation claim and is therefore entitled to a jury trial.  According to the Plaintiff, this is because the causation element of his retaliation claim can be inferred from the short amount of time—several weeks—between the date on which his EEOC claim was *dismissed* and the date on which he received his Notices of Termination.

As a general matter, the Plaintiff is correct.  Causation in a retaliation claim can be inferred from the temporal proximity between a plaintiff's protected activity and the adverse employment action he or she suffered.  *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988) ("Proof of

the causal connection can be established indirectly by showing that the protected activity was closely followed in time by the adverse action.").  However, in the absence of other evidence of retaliation, a time period of nearly a year between the Plaintiff's protected activity and the adverse employment action he or she suffered is insufficient to infer causation.  *See Chang v. Safe Horizons*, 254 Fed. App'x 838, 839-40 (2d Cir. 2007).  Thus, to make out his *prima facie* retaliation claim, the Plaintiff raises the following issue: for purposes of inferring causation in a retaliation claim, when does the temporal proximity "clock" begin to run?  In other words, what constitutes a "protected activity" that entitles the Plaintiff to protection from retaliation?  If, as the Plaintiff urges, dismissal of an EEOC complaint, by itself, constitutes a protected activity, the Plaintiff will be able to infer causation and make his *prima facie* case.  However, if the EEOC's dismissal is not, by itself, sufficient to infer causation, the Plaintiff would not be able to make out a *prima facie* retaliation claim, because the Plaintiff's only alleged protected activity—filing his EEOC complaint—occurred nearly a year before his termination and is therefore temporally too far removed to infer causation.

The relevant language in Title VII resolves this issue.  That language provides that an employer cannot take adverse action against an employee when the employee "has opposed any practice made an unlawful employment practice [under Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title

VII]."  42 U.S.C. § 2000e-3(a).  The Court interprets this language to provide that

only acts by the *employee*—not the EEOC—are "protected activities."  The Court

is mindful of the general proposition that employment discrimination statutes

should be interpreted broadly to effectuate their remedial purposes.  *See*

*Burlington No. & Santa Fe Ry. v. White*, 548 U.S. 53, 67 (2006) ("Interpreting the

antiretaliation provision to provide broad protection from retaliation helps ensure

the cooperation upon which accomplishment of [Title VII's] primary objective

depends.").  However, the Court must also take account of the interpretative

assumption that "Congress' choice of words is presumed to be deliberate."  *Univ.*

*of Tex. S.W. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2529 (2013).  The list of

protected activities set forth in Title VII is wide-ranging and comprehensive, but

there is simply no statutory text that suggests that an employee's *purely passive*

*act*, such as receiving an EEOC dismissal, could, by itself, be a "protected

activity."

Thus, even when the Court broadly interprets Title VII's list of protected

activities, the Court is still left with the conclusion that "protected activity" in the

context of a Title VII retaliation claim must include some action by the *Plaintiff*

that is related to filing, prosecuting, or participating in an employment

discrimination complaint.  *See Burlington No. & Santa Fe Ry.*, 548 U.S. at 63

("[Title VII's] antiretaliation provision seeks to prevent harm to individuals based

on *what they do*, *i.e., their conduct.*") (emphasis added).

By contrast, the Plaintiff's alleged protected activity in this case could not be captured within Title VII's list of activities; his receipt of an EEOC dismissal was entirely passive.  To be sure, the Plaintiff had to engage in protected activities to arrive at a point where he could receive the EEOC dismissal.  For example, the Plaintiff had to file a complaint and presumably played some part in its prosecution.  However, the Plaintiff does not allege—presumably because they are temporally too far removed from his termination to infer causation—that these activities in which he likely took part are, in any way, part of the protected activity that is relevant to his retaliation claim.

The case law in the Second Circuit bears out this definition.  *See, e.g.*, *Tregila v. Town of Manilus*, 313 F.3d 713, 720-21 (2d Cir. 2002) (counting proximity from the time when plaintiff submitted to the New York Department of Human Rights a list of witnesses who could corroborate the charges raised in his administrative complaint); *Richardson v. N.Y. Dep't of Corr. Servs*, 180 F.3d 426, 443 (2d Cir. 1999) ("There is no disagreement that [the plaintiff] engaged in protective activity when she complained to supervisors about harassment, filed her EEOC charge and filed her lawsuit.").  The Plaintiff has not provided, and the Court cannot find, any case law in the Second Circuit which supports the Plaintiff's position.  However, in support of his argument, the Plaintiff cites a case from the Third Circuit, *Waddell v. Small Tube Products, Inc.*, 799 F.2d 69 (3d Cir. 1986), in which the court inferred causation based on temporal proximity from the date on which the employee's administrative complaint was dismissed.

In *Waddell*, the plaintiff filed an administrative employment discrimination complaint in March 1975.  *Id.* at 71.  The complaint was dismissed on August 13, 1976.  *Id.*  The next day, August 14, 1976, the plaintiff's employer told the plaintiff that he should not report to work.  *Id.*  After a bench trial, the district court found that the incredibly short time between the dismissal of the complaint and the employee's termination—one day—was sufficient to establish causation for the plaintiff's *prima facie* retaliation case.  The Third Circuit affirmed the district court's finding without any recognition that it was inferring temporal proximity from the date on which an administrative complaint was *dismissed*.

The Court can find no case in this Circuit that has followed *Waddell*'s lead.  Thus, because Title VII's text points to the opposite conclusion, the Court declines to follow *Waddell*.  The Court therefore holds that the Plaintiff's receipt of a dismissal from the EEOC cannot, by itself, constitute a protected activity for purposes of inferring causation in a Title VII retaliation claim.  Accordingly, the Plaintiff cannot demonstrate causation in his *prima facie* retaliation claim solely on this basis.  The Plaintiff's second objection to the R&R is therefore rejected.

### C.  Plaintiff's Third Objection

The Plaintiff's final objection is that the R&R impermissibly relied solely on temporal proximity as evidence of causation and failed to consider evidence demonstrating that the Plaintiff's supervisors had retaliatory intent.  As Judge Schroeder noted, "[p]roof of causation [in a Title VII retaliation claim] can be shown either (1) indirectly, by showing that the protected activity was followed

closely by discriminatory treatment . . .; or (2) directly, though evidence of retaliatory animus directed against the plaintiff by the defendant."  Dkt. No. 50 at 18 (citing *Hicks v. Baines*, 593 F.3d 159, 170 (2d Cir. 2010)).  The Plaintiff's previous objection, concerning temporal proximity, was directed at the first method of proving causation in a retaliation claim.  The Plaintiff's final objection appears to be aimed at the second method of proving causation: evidence of a retaliatory motive.  *See* Dkt. No. 54-1 at 2.

To infer retaliatory motive on the part of the Plaintiff's supervisor, the Plaintiff relies on the following chain of reasoning:

- "Ms. Bailey [the Officer in Charge of the Jamestown Post Office] was angry at Mr. Holmes for having been named as a bad actor in the original EEO complaint
- Ms. Bailey was angry enough that she told Mr. Holmes that 'she wanted him out of his office'
- Barring that one slip, Ms. Bailey realized that she would run a substantial risk if she took any action against Mr. Holmes while the EEO complaint was pending
- Once the EEO complaint was dismissed, Ms. Bailey saw an opportunity to take her revenge against Mr. Holmes
- Starting within 12 days of the dismissal Ms. Bailey engineering two altercations between Mr. Holmes and one of Ms. Bailey's subordinate supervisors, each resulting in police intervention
- Ms. Bailey explicitly relied upon Mr. Holmes's resort to police intervention to suspend him without pay pending charges seeking termination

- Ms. Bailey took these actions because of her anger at Mr. Holmes for his original EEO complaint and her desire to retaliate against him for it."

Dkt. 54-1 at 3.  The Plaintiff argues that this evidence is sufficient to establish his supervisors' retaliatory motive and that, accordingly, the Plaintiff has made out his *prima facie* case, which entitles him to go to a jury.  In response, the Defendant relies on a recent Supreme Court opinion, *University of Texas Southwest Medical Center v. Nassar*, 133 S. Ct. 2517 (2013), to argue that even if the chain of reasoning set forth above is sufficient to demonstrate retaliatory intent for the Plaintiff's *prima facie* claim, the Defendant is still entitled to summary judgment.

*Nassar* held that Title VII retaliation claims and Title VII status-based discrimination claims employ different causation standards.  The latter require plaintiffs to satisfy the "motivating factor" standard of causation as set forth in 42 U.S.C. § 2000e-2(m).  Under that standard, an employee could obtain at least some form of relief if he or she proved that a protected characteristic, such as race, color, religion, or sex, "was a motivating factor for any employment practice, even though some other factors also motivated the practice."  42 U.S.C. § 2000e-2(m).  However, *Nassar* held that Title VII retaliation claims are subject to a heightened causation standard.  According to *Nassar*:

> Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e-2(m).   This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.

*Nassar*, 133 S. Ct. at 2533.  The Second Circuit elaborated on *Nassar*'s but-for test in *Kwan v. Andalex Group LLC*, 737 F.3d 834 (2d Cir. 2013).  According to *Kwan*, "[a] plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action.  From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Id.* at 846.  Thus, the Plaintiff in this case can defeat summary judgment on his retaliation claim by showing weaknesses in the Defendant's proffered legitimate non-discriminatory reasons for twice removing the Plaintiff from his position.[3]

The Court can find no genuine factual issue as to whether the Defendant's stated reasons for terminating the Plaintiff were mere pretext to cover up a

---

[3] To be sure, the Plaintiff's task would generally be the same if he were opposing summary judgment on a Title VII status-based discrimination claim.  The effect of *Nassar* appears to be that the Plaintiff has a more difficult hill to climb if he is opposing summary judgment on a retaliation claim.  That is, to create a triable issue of fact in a retaliation claim, the Plaintiff must show "weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate nonretaliatory reasons" that are more glaring than those that might suffice to defeat summary judgment on a status-based discrimination claim.

retaliatory motive.[4]  In other words, applying *Nassar*, the removal notices were the natural outcome of the Plaintiff's disciplinary record and his two April 2009 encounters with his supervisor.  The Plaintiff has brought forth no evidence that creates a triable issue of whether the Post Office's legitimate non-discriminatory reasons for its action were pretextual.  Accordingly, the Plaintiff has not met his burden in opposing summary judgment.

However, in an effort to defeat summary judgment, the Plaintiff has pointed to an arbitrator's decision after the Plaintiff grieved his removal.  *See* Dkt. No. 54-1 at 8; Dkt No. 33 ¶ 93.  The arbitrator found that "[t]here was no evidence that anyone reasonably believed the [Plaintiff] was a danger to himself or others.  The act of calling the police may be improper for entirely separate reasons, but in the absence of evidence that the act of calling law enforcement to the Jamestown post office posed a risk of harm to the [Plaintiff] or others, there was no just cause to invoke the emergency placement procedure" that occurred after the April 14 incident.  Dkt. No. 33-3 at 23.  The arbitrator accordingly found that the Plaintiff's "emergency placement and discharge were without just cause" and ordered reinstatement and back pay.  *Id.* at 28.

However, the arbitrator's conclusion does not change the analysis under *Nassar*.  That the Plaintiff received notices of removal—an action he characterizes as an "overreact[ion]" on his supervisor's part, Dkt. 54-1 at 7—

---

[4] Because the Court holds that the Plaintiff would have been terminated regardless of whether his supervisors had a retaliatory animus, the Court does not address whether his supervisors did, in fact, intend to retaliate against the Plaintiff.

rather than a lesser penalty, was merely a consequence of the fact that the

Plaintiff's numerous prior infractions had moved him to the final step of the

disciplinary system in place at the Jamestown Post Office.  *See* Dkt. No. 33 at ¶

11; Dkt. No. 50 at 2; Dkt. No. 33-7 at 33 (noting that the disciplinary system

progressed from a letter of warning, to a seven-day suspension, to a fourteen-

day suspension, to removal).  Indeed, applying *Nassar*'s but-for test, the Second

Circuit has repeatedly affirmed summary judgment on Title VII retaliation claims

in cases where an employee's disciplinary record pre-dated any alleged

retaliation.  *See Sarkis v. Ollie's Bargain Outlet*, ___ Fed. App'x ___, 2014 WL

1063518, at *2 (2d Cir. Mar. 20, 2014) (affirming summary judgment on

retaliation claim where plaintiff had received "numerous reports of poor

performance and disciplinary infractions, some of which were issued before the

activity that allegedly triggered the retaliation occurred"); *Wolf v. Time Warner,

Inc.*, 548 Fed. App'x 693, 695-96 (2d Cir. 2013) ("In light of the evidence in the

record indicating that [the employer] had received numerous complaints about

[the employee] and had placed her on a probationary program, all before

receiving her discrimination complaint, we cannot conclude that 'but for' her

complaint, she would not have been fired."); *Puglisi v. Town of Hempstead, Dep't

of Sanitation, Sanitary Dist. No. 2*, 545 Fed. App'x 23, 25-26 (2d Cir. 2013) ("[The

plaintiff's] burden requires him to show more than the possibility of retaliatory

animus; he was required to adduce sufficient evidence to permit a reasonable

jury to find that 'but for' defendants' retaliatory bias, he would not have been

terminated. . . . Thus, we conclude that [the plaintiff] bears the but-for causation burden pronounced in *Nassar*, and that comments attributed to [defendants] are insufficient to carry that weight against overwhelming evidence supporting defendants' nondiscriminatory reason for demoting [the plaintiff], i.e., a Civil Service Commission decision."). *Cf. Fuqua v. First Niagara Bank*, 12-CV-046S, 2014 WL 581776, at *7 (Feb. 14, 2014 W.D.N.Y.).

In a last-ditch attempt to defeat summary judgment, the Plaintiff has suggested that he was essentially set up—that, in an effort to retaliate against the Plainitff, his supervisors "engineered" the two confrontations that led to his calling the police.  However, the Plaintiff has brought forth no evidence showing that the reasons for his two encounters with Robert Marsh were anything but routine.  The Officer in Charge of the Jamestown Post Office, Cynthia Bailey, testified that in March 2009, she had instructed Marsh "to go to all employees, all the city carriers and update the MSPs and 1546s."  Dkt. 33-7 at 18 62:15-17.  This task required Marsh to update *all forty-three routes* at the Jamestown Post Office.  *Id.* at 62:19-63: 12.  Indeed, even the arbitrator, who otherwise seemed to view the facts of each incident very favorably for the Plaintiff, found nothing untoward about Marsh's conduct and indicated that Marsh's encounters with the Plaintiff were simply part of the assignment that Bailey had given to Marsh.  *See* Dkt. No. 34-2 at 10 & n.1 (Arbitrator's Decision) (noting that the "Jamestown postmaster assigned Robert T. Marsh, Jr. . . . to complete the portion of the delivery instructions (Form 1564) for each letter carrier pertaining to the

24

authorized lunch period, lunch locations and break locations" and that "[i]t was undisputed that Marsh had received training on the preparation of Form 1564s, and that due to the work load on the customer service supervisors he was directed to complete the forms for each route in the Jamestown post office").

The Plaintiff has brought forward no evidence that the Plaintiff's supervisors took these steps—requiring Marsh to update the MSPs for all forty-three routes at the Jamestown Post Office—solely so that he could have two encounters with the Plaintiff that would eventually lead to the Plaintiff's termination.  Although the Court must view the facts on summary judgment in the light most favorable to the non-moving party—here, the Plaintiff—so too must the Court only indulge the Plaintiff's "justifiable inferences."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of the non-movant [on summary judgment] is to be believed, and all justifiable inferences are to be drawn in his favor.").  The inference that the Plaintiff asks the Court to draw here is not justifiable.  *See Davis v. State of New York*, 316 F.3d 93, 100 (2d Cir. 2002) ("[C]onclusory statements or mere allegations [are] not sufficient to defeat a summary judgment motion.").

Thus, assuming that the chain of events set forth in the Plaintiff's objections is sufficient to establish the causation element of his *prima facie* retaliation claim, there is no genuine factual dispute as to whether the Defendant's legitimate non-discriminatory reasons for removing the Plaintiff were pretextual.  Accordingly, the Plaintiff's third objection is rejected.

## Conclusion

The Court adopts Judge Schroeder's report and recommendation.  For the reasons set forth in the report and recommendation, as well as those set forth above, the Defendant's motion for summary judgment, Dkt. No. 32, is granted in its entirety.

**SO ORDERED.**

　s/ Richard J. Arcara
HONORABLE RICHARD J. ARCARA
UNITED STATES DISTRICT JUDGE

DATED: June 25, 2014